# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DANIEL LUBIC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Case No. 4-25:cv-04809 |
| CART.COM, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE COURT:

COMES NOW Plaintiff Daniel Lubic ("Plaintiff") to file this Second Amended Complaint against Defendant Cart.com, Inc. ("Defendant"), and would respectfully show:

**I.**

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff is an individual residing at 2651 SW. 119th Terrace, Unit 1111, Miramar, Florida 33025.  Plaintiff is a citizen of the State of Florida for purposes of diversity jurisdiction.

2.      Defendant Cart.com, Inc. is a corporation organized under the laws of the State of Delaware, but is registered to do business in Texas, with its principal place of business in Texas located at 1334 Brittmoor, Suite 225, Houston, Texas 77043.  Defendant is a citizen of the States of Texas and Delaware for purposes of diversity jurisdiction.  Defendant has been served and has appeared in this action.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction). Plaintiff is a citizen of Florida, and Defendant is a citizen of Delaware and Texas for diversity purposes as a Delaware corporation with its principal place of business in Texas. The amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in Texas, regularly conducts substantial business activities in Texas, and the claims arise out of Defendant's business activities in Texas.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant maintains its principal place of business in this District and a substantial part of the events giving rise to the claims occurred in this District.

## II.

## FACTUAL ALLEGATIONS

A. Defendant's Business.

6. Defendant is a nationwide e-commerce fulfillment company that provides technological and logistics services to support its clients' e-commerce needs. Defendant offers a wide array of service offerings which permit its clients to implement online purchasing interfaces; integrate their sales and products listings in established online marketplaces; track, manage and analyze product sales and marketing; implement marketing strategies; and handle product order fulfillment.

7. Clients can select which services they procure from Defendant, but at a basic level Defendant operates as a fulfillment center: contracting with its clients to move their inventory into Defendant's warehouse space and, from there, Defendant managing and distributing clients' inventory to their customers based on client's customer orders or distributing client inventory to

other fulfillment centers as clients require.  Defendant charges their clients fees for the services Defendant provides.

8.      Each client of Defendant's is, upon information and belief, party to a contractual arrangement with Defendant by which the Defendant's services will be provided to the client and by which the client will pay for such services.  These contractual arrangements generally contemplate that services will be provided over an extended period of time, generating a revenue stream for Defendant from each contract entered into with a client.

B.      Plaintiff's Employment with Defendant.

9.      Defendant hired Plaintiff in March 2023 as its Vice President of Strategic Sales, a position he assumed on April 3, 2023.  In this role, Plaintiff was to lead a team of twelve individuals as the Strategic Sales Team in efforts to expand Defendant's foothold in securing non-government contracts[1] from clients for Defendant's fulfillment centers.

10.     Plaintiff signed an employment agreement with Defendant upon accepting the Vice President of Strategic Sales position in April 2023. As part of this written agreement, Plaintiff was to receive a base salary of $300,000.00 per year plus an "override Commission" of 0.75% of invoiced and paid revenue during one year of services to a new client for any new contracts his Strategic Sales Team generated.

11.     However, Defendant did not establish the full "Strategic Sales Team" of twelve contemplated, nor did Defendant provide Plaintiff the support for him to do so.  Though Plaintiff demonstrated individual success in generating new business, a little more than six (6) months after hiring Plaintiff to lead the Strategic Sales Team, Defendant elected to eliminate the Strategic Sales

---

[1] As a government contractor, Defendant is required adhere to stricter legal and regulatory requirements than private companies.

Team.  As Plaintiff's role with the Defendant had been to lead and manage the Strategic Sales Team, this decision was to have a material impact on Plaintiff.

C.    Plaintiff's Changing Job Role, and Careismatic Brands Sales.

12.    Yet Plaintiff had shown exceptional promise in his personal sales performance for Defendant based on his deep sales experience.  When Defendant informed Plaintiff that it was eliminating the Strategic Sales team in a phone call from Defendant's Executive Vice President Jeff Zisk on October 26, 2023, Defendant also expressed interest in keeping Plaintiff as an employee despite eliminating the team he had been hired to lead.  Defendant recognized that with Plaintiff's deep sales experience he would be extremely valuable in an individual contributor role where he would be responsible for personally bringing in new clients and securing new business rather than primarily leading, managing and developing a team to do that work.  In their conversation, Mr. Zisk told Plaintiff that Defendant wanted him to transition to an individual sales role upon the dissolution of the Strategic Sales Team which would involve not only a change in Plaintiff's job duties but his compensation and commission structure.

13.    To induce Plaintiff to remain in the at-will employment relationship with Defendant and continue to develop business and procure new client relationships, Mr. Zisk communicated that Defendant was offering to keep Plaintiff's job title as Vice President of Strategic Sales, but would provide dramatically different job duties and compensation moving forward after elimination of the Strategic Sales Team.  Plaintiff's new job responsibilities would shift from managing and leading the Strategic Sales Team, and turn to Plaintiff taking primary responsibility for direct development of new business and securing new client contracts on behalf of Defendant. In exchange for the altered job duties, Defendant promised Plaintiff a restructured compensation package which would increase Plaintiff's commission rates from the prior override level of 0.75%

on sales generated by his full team to a commission rate of 2% on sales generated through his personal efforts.

14.     Content with the terms offered by Defendant to continue the parties' at-will employment relationship, Plaintiff elected to accept the changes and continue on in his new role under his old title and with the new commission structure.

15.     At the time of his October 26, 2023 conversation with Mr. Zisk, Plaintiff was actively working to secure a large account with Careismatic Brands, and Defendant knew it.  Just two days prior, Plaintiff had made contact with Careismatic Brands at a trade show and immediately persuaded the company's Chief Operating Officer to explore how Defendant's products and services would meet their needs and potentially save the company millions of dollars in imminently planned capital expenditures.  Plaintiff was clear, persuasive, and immediately identified the substantial savings Careismatic Brands could achieve by entering into a valuable contract for Defendant's services – on the order of $25 million in net cost savings if Careismatic Brands outsourced warehousing services to Defendant which would generate on the order of $65 million in revenue from a new customer for Defendant.

16.     By the next day, Plaintiff arranged and led a meeting between Defendant and Careismatic Brands to deliver the key sales messaging to executive leadership.  Prior to the meeting, Plaintiff briefed Defendant's attendees, Mr. Zisk and Ed Sturrock, on the sales strategy, prior discussions with Careismatic Brands' Chief Operating Officer, and the value proposition Plaintiff had identified.  Careismatic Brands' Chief Operating Officer, Chief Information and Technology Officer, and Chief Financial Officer were in attendance and the audience.

17.     Plaintiff led and handled the majority of the meeting for Defendant.  He delivered the key sales messaging to the Careismatic Brands' executives focused around the opportunity

Plaintiff had identified at the trade show by which Careismatic Brands could achieve significant capital cost and operating savings.  Though final terms would have to be reached, the difficult part of the sale – generating committed interest from key decision-makers necessary so that parties would be willing to devote the time and resources to formalizing the relationship – was done by the end of the meeting.

18.    The day after the meeting with Careismatic Brands' executive leadership came Mr. Zisk's phone call informing Plaintiff that the Strategic Sales Team was being dissolved and seeking to convince Plaintiff to accept the restructuring of his job duties and compensation rather than exercise the "at-will" nature of his employment and take his talents elsewhere.

19.    Plaintiff was not immediately sold on Defendant's proposal following Mr. Zisk's call on October 26, 2023, but Defendant was pressing forward.  On November 1, 2023, in a follow-up call with Mr. Zisk, Plaintiff was told that his request to delay the reorganization of his job by 90 days was going to be denied, and that the Defendant needed to know his plans.

20.    Mr. Zisk was very clear in the terms that Defendant was offering for Plaintiff to continue in its employ, both in his phone call on October 26, 2023 and the follow up call on November 1, 2023.  Beyond the general conversations that Plaintiff would be entitled to earn commissions on individual sales of 2% under the Defendant's commissions policies, Mr. Zisk made specific and clear promises to Plaintiff with respect to a commission from any deal with Careismatic Brands if the transaction came to fruition: (1) that Plaintiff  "would make a fortune" from the commission on the Careismatic Brands account if the deal closed; and (2) that Plaintiff would "be paid on the Careismatic deal as an individual contributor" at a 2% commission rate rather than the 0.75% "override Commission" rate.  Mr. Zisk further represented to Plaintiff that

the restructuring of his job would financially benefit him because both his commission rate would increase and he would receive sales leads from the Defendant.

21.     Plaintiff ultimately elected to accept Defendant's offer to remain employed under what may have been the same job title but in what was essentially a new job, and he made that choice based upon the express promises Defendant had made to him about how he would be compensated for that work.

D.  Careismatic Brands Deal Reached and Commission Earned.

22.     Careismatic Brands had no previous known substantive contact or relationship with Defendant at the time Plaintiff made their acquaintance.  Plaintiff successfully pitched the business to Careismatic Brands.  Without Plaintiff's efforts, Defendant likely would never have secured Careismatic Brands' business given the company's imminent plans to construct their own warehouse facility at the time Plaintiff made contact and swiftly sold them on the viability of the alternative solution Defendant could provide at lower cost.  Once Careismatic Brands' interest was solidly established, Mr. Zisk directed Plaintiff to step aside from the Careismatic Brands negotiations – and in fact, blocked Plaintiff from participating further in certain meetings with Careismatic Brands despite his requests – but at that point Plaintiff had already won the business.  Plaintiff had generated the customer's interest, had identified the solution that Defendant could provide, had convinced the customer of the benefits of Defendant's services, and at the point Mr. Zisk excluded Plaintiff from the conversation the sale was already Defendant's to lose.

23.     Defendant did not, however, lose the Careismatic Brands sale.  In February 2024 the final contract documents were signed.  Through Plaintiff's efforts in courting and developing Careismatic Brands, Defendant entered into a contract with the customer which generated approximately $65 million in revenue for Defendant, broken out into approximately $25 million

in warehouse revenue and an additional $40 million in transportation revenue. Under the terms of the Compensation Plan, Plaintiff should have been paid approximately $500,000.00 for the warehouse revenue and $300,000.00 for the transportation revenue, for a total of $800,000.00 in commission for his role in procuring the new business opportunity for Defendant.

24.     Around the same time, the prior oral agreements between Defendant and Plaintiff arising from the October 26, 2023 and November 1, 2023 phone conversations with Mr. Zisk were formalized with respect to matters moving forward.  Mr. Zisk had already promised and represented to Plaintiff that Plaintiff would be paid a 2% commission on the Careismatic Brands deal if it came to fruition, and as to other business Plaintiff would generate the Plaintiff and Defendant agreed that Plaintiff would earn commissions of 2% on "Qualifying Sales" under the terms of the 2024 Sales Incentive Compensation Plan.

25.     The contract Careismatic Brands entered into with Defendant was subject to the express promises made by Mr. Zisk on October 26, 2023 and November 1, 2023 that Plaintiff would received a 2% commission on that deal if it closed.  By agreeing to the 2024 Sales Incentive Compensation Plan, Plaintiff had no intention of agreeing to different terms than Mr. Zisk had previously agreed to with respect to the Careismatic Brands commission.

26.     However, to the extent, if any, that Mr. Zisk's express promise as Defendant's Executive Vice President was overridden by the terms of the 2024 Sales Incentive Compensation Plan, the contract Defendant entered into with Careismatic Brands constituted a Qualifying Sale under the 2024 Sales Incentive Compensation Plan.  Under both Plaintiff's prior oral agreement with Defendant and the terms of the 2024 Sales Incentive Compensation Plan, Plaintiff became entitled to a 2% commission on the total annual revenue (less adjustments for certain costs, pass-through charges, and uncollected amounts) as he was the but-for cause of Defendant procuring the

contract and Plaintiff had complied with all of Defendants policies and procedures in making the sale.

E.      Defendant Refuses to Pay Commission and Terminates Plaintiff When He Seeks What He Was Promised.

27.     Despite its express promises and policies, Defendant elected to try and deprive Plaintiff of the commission Plaintiff had fairly earned, and which Defendant had promised Plaintiff if both the Careismatic Brands sale closed and Plaintiff remained working for Defendant after Defendant materially restructured Plaintiff's job.

28.     Rather than paying Plaintiff the full amount of the commission Defendant had represented to Plaintiff he would be entitled to receive, Defendant told Plaintiff on March 18, 2024 that his sales commission would be reduced from more than $500,000.00[2] to $50,000.00 as a "finder's fee" – despite Defendant offering to pay finder's fees to third-parties procuring sales at a much higher rate of 3%.  When Plaintiff indicated that the reduction would not be acceptable to him in light of both the promises Defendant had made to Plaintiff and his role in procuring the sale, Plaintiff's direct supervisor acknowledged that the full commission Plaintiff had been promised should be paid to Plaintiff.  Plaintiff's supervisor said he would see what he could do.

29.     Plaintiff's direct supervisor did not communicate any substantive updates to Plaintiff after that, so on March 27, 2024, Plaintiff made a formal inquiry to Defendant as to his concern that the Defendant had not paid him the full compensation he was owed.

30.     Instead of providing a response to Plaintiff's pay inquiry, Defendant terminated Plaintiff's employment on April 4, 2024.  Defendant summoned Plaintiff, with approximately 30

---

[2] No mention of the transportation revenue was made at that time. Transportation commission is calculated on a different scale than warehouse, thus accounting for the lower commission amount despite the higher revenue total.

minutes' notice, to a Zoom meeting where Defendant informed Plaintiff "we are letting you go and today is your last day."

31.     During this Zoom meeting, Defendant somewhat incredibly told Plaintiff that the reason for the termination was that Plaintiff was "not meeting expectations." During his year of employment with Defendant, Plaintiff had never received any notice of performance deficiencies, was never placed on or threatened with a performance improvement plan, and was never given written or verbal warnings of any sort.  During that same period, Plaintiff had, however, generated the largest sales pipeline of any individual contributor in the company, brought in more private-sector business than any other individual contributor during the same period, and demanded that Defendant honor its promises to compensate him fairly and in accordance with their agreements.

32.     Rather than pay Plaintiff the commissions he was entitled to, at the time Defendant terminated Plaintiff's employment Defendant offered Plaintiff the same $50,000.00 plus one month's salary, seeking to have Plaintiff take the funds and release any further claims he may have against Defendant.  Plaintiff declined.

33.     Unfortunately, the Careismatic Brands commission is not the only commission Plaintiff earned that Defendant has failed and refused to pay in accordance with its own policies, or even the promises it made to Plaintiff.  Defendant failed and refused to pay other commissions Plaintiff earned under the 2024 Sales Incentive Compensation Plan in connection with Qualifying Sales to Prestige Medical and, upon information and belief, Warner Music, VHA Opportunities, and other deals.

34.     Upon information and belief, Defendant has also terminated other employees while offering to pay only drastically reduced commission amounts rather than those promised to employees or set forth in the Defendant's policies, including Steve Perryman and Brittany Visin.

It reflects a pattern which indicates that it is intentional upon Defendant's part to induce talented sales employees to work on terms that Defendant has no intention of living up to.

F.     2024 Sales Incentive Compensation Plan is Ambiguous But Entitles Plaintiff to Payment of the Commissions He Earned.

35.     Defendant's 2024 Sales Incentive Compensation Plan is arguably ambiguous as to the terms of the commission program Defendant alleges Plaintiff must have satisfied in order to be entitled to the 2% commissions on the sales Plaintiff procured, including the Careismetic Brands contract if it applies independently of Defendant's express promises.

36.      First, the 2024 Sales Incentive Compensation Plan sets forth very clear, deliberate, and detailed criteria as to when commissions will become "Earned Commissions", as to what constitutes a "Qualifying Sale" upon which commissions can be earned, the generated revenues that will be considered in commission calculations, how those calculations may be adjusted using certain specified criteria, and the timing for when commissions will be credited.  These provisions are clear, and clearly entitle Plaintiff to payment of commission on the Careismatic Brands contract.

37.     However, a single line in the 10 page 2024 Sales Incentive Compensation Plan under "Timing of Qualifying Sales" provides: "The CFO and GTM Operations have full discretion and final authority on whether conditions have been met to be considered Earned Commissions and with regards to Amount and Timing."  It is clear that Defendant retroactively takes the position that the "full discretion" permits the two identified individuals to disregard the actual plan terms, and to override the specified conditions for amount and timing rather than apply the policy terms as written.  This is simply not supported by law.

38.     Defendant's attempt to pay Plaintiff *some* of the commission he earned on the Careismatic Brands sale makes clear that he was deemed to have satisfied the conditions to be

entitled to an Earned Commission under the 2024 Sales Incentive Compensation Plan and particularly the most discretionary – that he was responsible for procuring the customer.  Further, the amount of the commission was subject to fulsome calculations and rules set forth in the plan, and the CFO and GRM Operations' discretion is limited to applying those plan rules by the language of the plan.  There is simply no factual or discretionary basis within those terms by which the Plaintiff's earned commission could have been legitimately reduced by 90%, and the discretion granted to Defendant's specified officers was not the *carte blanche* to override the terms of the plan at their whim lest the entire plan be illusory.

39.     The 2024 Sales Incentive Compensation Plan is further ambiguous in that it does not provide any indication or guidance for what constitutes a "Windfall" which arguably makes the term subject to unilateral and unfettered alteration of the commission percentage or payment under the agreement.  However, it is clear that the Windfall provision of the agreement was never invoked.

40.     First, Defendant simply never invoked it or communicated to Plaintiff that it was invoking it.  Had the "profit margins not been at an acceptable level" or the Careismatic Brands deal been an "exceedingly large opportunity[]", Defendant would have logically just informed Plaintiff that it was reducing the commission under this provision when it offered him the $50,000.00 instead.  It never did so.

41.     Second, the amount of the commission was not an "exceedingly large opportunity" in light of not only the revenue being generated by the contract but also the history of Plaintiff's role with the Defendant pre-dating the termination of the Strategic Sales Team.  Prior to Plaintiff's shift into his new role, he was to receive the 0.75% "override Commission" on all sales made by his entire team – which Defendant would have had to pay additional commissions on to the team

members.    Defendant sold Plaintiff on accepting the new role expressly because the 2% commission on sales he generated was expected to replace the 0.75% "override Commission" generated by a full team.

42.    Further, upon information and belief, Defendant's executive team never determined that Plaintiff was disqualified from being a Participant in the 2024 Sales Incentive Compensation Plan or receiving any portion of the incentives offered as part of the plan.  Plaintiff was never informed that he was a poorly performing employee.  He had no disciplinary issues and was never placed on a performance improvement plan of any sort.  To the contrary, Plaintiff procured sizeable sales generating large revenues for Defendant.  Defendant simply did not want to live up to its end of the agreement by paying Plaintiff the amounts it had promised him for being successful on Defendant's behalf.

43.    Defendant's promises to its employees with respect to commissions in commission-eligible positions such as Plaintiff's make clear Plaintiff is entitled to his 2% commission on the Careismetic Brands sale.  All conditions were satisfied for the commission to accrue, the adjustments to the amount of the commission Defendant attempted to make – a 90% reduction – are not supported by the terms of the plan and policy as it was then in force, and upon information and belief Defendant did not undertake any of the steps required to amend the plan before Plaintiff's commissions had accrued.

G.    <u>Defendant Still Hasn't Paid, Despite Demand</u>.

44.    Unfortunately, Defendant is following a pattern of behavior.  Upon information and belief, during the same general time period since Plaintiff first worked for Defendant, Defendant has terminated employees either shortly before or shortly after the employee earned a significant

commission – by making a significant sale to boost Defendant's revenue – to avoid payment obligations.

45.    Plaintiff was expressly promised the commission he earned on the Careismatic Brands deal to stay in his role with Defendant mere hours after he had initiated contact and done the key pitch to secure interest.  Plaintiff was terminated a mere seven days after he made clear that he expected Defendant to honor that promise.

46.    Plaintiff has accordingly been required to retain legal counsel to seek recovery of the funds that Defendant promised him, and the promise he relied on to continue employment with Defendant after his job role and compensation structure was to radically change.

47.    Defendant still has not paid the commissions it owes Plaintiff, which total approximately $810,000.00, despite Plaintiff's written demand.

### III.

### COUNT ONE

### BREACH OF CONTRACT

48.    Plaintiff incorporates all preceding paragraphs by reference.

49.    The oral agreement between Plaintiff and Defendant formed by Plaintiff's acceptance of continued employment on the terms promised by Executive Vice President Jeff Zisk on October 26, 2023 with agreement reached on November 1, 2023, together with the 2024 Sales Incentive Compensation Plan, constitute enforceable agreements between Plaintiff and Defendant.

50.    In each case, Defendant made the offer to Plaintiff by extending the terms of the plan and other compensation in exchange for Plaintiff's continued employment with Defendant despite the vastly changed terms in Plaintiff's job duties.  Plaintiff accepted the offer by agreeing to continue in the new role on those terms.  Defendant's promises and Plaintiff's labors on behalf of Defendant formed the consideration each party received and provided for the agreements, and

there was a clear meeting of the minds as Plaintiff accepted exactly what Defendant had expressly promised: that he would be paid a 2% commission on the Careismatic Brands deal as well as other business he generated if the deals actually closed.

51. The Careismatic Brands deal is governed by the oral agreement reached with Defendant on November 1, 2023 on the terms offered and communicated by Mr. Zisk. In the alternative, such deal is governed by the oral agreement reached with Defendant on November 1, 2023 on the terms offered and communicated by Mr. Zisk as it may have been modified through mutual agreement of the parties by the 2024 Sales Incentive Compensation Plan. The other deals giving rise to unpaid commissions, Prestige Medical, Warner Music, and VHA Opportunities, are, upon information and belief, governed by the 2024 Sales Incentive Compensation Plan.

52. Plaintiff performed under the agreements. Defendant has not, breaching the agreements.

53. Plaintiff satisfied all conditions to entitle him to receive the promised 2% commission on the Careismatic Brands, Prestige Medical, Warner Music, and other sales. In each case, a valid contract was entered into by the Defendant with the new customer, the customer was procured by Plaintiff and Defendant's CRM system reflected him as the account owner at the time the sale was made, Plaintiff complied with all of Defendant's policies and instructions from Defendant's leadership like Mr. Zisk, the customers didn't terminate the contracts within one year, and the customers made payments under the contracts. Upon information and belief, no commission changes were approved in writing by Defendant's CFO to vary Plaintiff's commission amount from the promised 2%.

54.    Defendant breached the agreements by failing to pay what it had promised to Plaintiff upon Plaintiff satisfying the conditions to Defendant's commission payment obligation accruing.

55.    Defendant's breach of the agreements is not excused by the alleged discretion granted to Defendant's identified personnel under the terms of the 2024 Sales Incentive Compensation Plan.  The discretion granted by the terms of the plan is the discretion to determine issues in compliance with its terms, not to override or elect not to comply.  While there are viable paths Defendant could have taken to reduce the amount of the commission payable to Plaintiff, it didn't do so.  Rather, Defendant failed to perform its end of the bargain.

56.    To the extent, however, that Defendant's performance under the agreements with Plaintiff was solely in Defendant's discretion, it was required to refrain from acting in bad faith. Defendant's conduct recited herein evidences such bad faith.

57.    Plaintiff made written demand on Defendant prior to filing suit, and is entitled to recover its actual damages caused by Defendant's breach of the commission agreement in the form of the unpaid but earned commissions Plaintiff is entitled to, its reasonable and necessary attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code §38.001, and pre- and post-judgment interest.  Defendant's breach has been the direct and proximate cause of damage to Plaintiff for which he demands judgment in an amount to be shown at trial.

58.    Defendant's breach has forced Plaintiff to retain the services of the undersigned attorneys to prepare and prosecute this suit. Plaintiff is therefore entitled to recover reasonable attorneys' fees necessary to prosecute his claims for breach of contract under Chapter 38 Section 38.001(8) of the Texas Civil Practice and Remedies Code.

59.    In asserting this claim, Plaintiff does not waive any of the rights and/or alternative remedies allowed at law or in equity.

## IV.

### COUNT TWO

### FRAUD/FRAUDULENT INDUCEMENT

60.    Plaintiff incorporates all preceding paragraphs by reference.

61.    Defendant, through its Executive Vice President Jeff Zisk, made material misrepresentations of fact to Plaintiff on October 26, 2023 and November 1, 2023 in order to induce Plaintiff to remain in Defendant's employ in the new role that they wanted him to assume. These misrepresentations included that Defendant would pay Plaintiff a 2% commission on the Careismatic Brands deal if it closed and Plaintiff would "make a fortune" if the deal came to fruition, and that Plaintiff accepting 2% individual contributor commissions would financially benefit Plaintiff more than the 0.75% "override Commissions" Plaintiff had previously received on team sales.

62.    These misrepresentations were false at the time they were made or were made with reckless disregard for the truth, as it is clear that: (1) based on Defendant's pattern of terminating other employees due large commissions Defendant knew or should have known that it had no intention of performing should the Careismatic Brands deal close, but would rather – as happened – terminate Plaintiff if he would not meekly acquiesce to a materially different commission; and (2) Mr. Zisk's subsequent actions in deliberately excluding and prohibiting Plaintiff from further involvement with Careismatic Brands shortly thereafter indicated Defendant's intention from the outset was to not honor its representation to Plaintiff that he would be paid 2% on the deal if it closed.

63.     Defendant's misrepresentations were material.  Plaintiff is a seasoned sales professional, and commissions are a primary basis by which employees in such roles are compensated fairly for their successes.  A 2% commission is a relatively common commission level but it is a key component of a successful salesperson's compensation and earnings.

64.     Plaintiff reasonably relied on Defendant's misrepresentations, and was induced to remain in Defendant's employ as an individual sales representative following elimination of the Strategic Sales Team he managed.  And this was, in fact, Defendant's intent – that Plaintiff believe Mr. Zisk's promises and remain working for Defendant to, among other reasons, not jeopardize the new relationship Plaintiff had formed with Careismatic Brands.

65.     Plaintiff's reliance on Defendant's misrepresentations caused him injury.  Had Plaintiff known that Defendant had no intention of paying the commissions it had promised in Plaintiff's new role where he was individually responsible for making sales, Plaintiff would have not devoted the following months to developing business for Defendant that he would never be compensated for.  Rather, he would have taken his sales talents – a skill set for which there is ready demand – and spent that time selling products and services for an employer who would actually pay promised commissions.

66.     Owing to Defendant's fraudulent conduct, Plaintiff is entitled to recover his damages for economic injuries proximately caused by Plaintiff's reasonable reliance on Defendant's material misrepresentations.  Plaintiff has suffered damages  and is entitled to recover amounts for but not limited to: (a) benefit of the promised additional compensation of approximately $800,000.00; (b) out of pocket damages incurred as a result of Defendant's fraudulent conduct; and (c) exemplary and consequential damages to be shown at trial.

**V.**

## COUNT THREE

## PROMISSORY ESTOPPEL

67.     Plaintiff incorporates all preceding paragraphs by reference. This count is pleaded in the alternative to Counts I and II pursuant to Federal Rule of Civil Procedure 8(d).

68.     Between October 26, 2023 and November 1, 2023, Defendant, through Mr. Zisk, made specific, definite promises to Plaintiff: that Plaintiff would be paid 2% commission on the Careismatic Brands deal as an individual contributor, that the restructuring would financially benefit him, and that he would "make a fortune" from the Careismatic account. These promises were made at the precise moment Plaintiff had the leverage to demand written commission protections as a condition of accepting the restructured role, or to decline the restructuring entirely.

69.     It was entirely foreseeable to Defendant that Plaintiff would reasonably rely on these promises. Defendant made them for the express purpose of inducing Plaintiff's acceptance of the restructuring.  In reliance on Defendant's promises, Plaintiff accepted the restructuring without demanding written commission guarantees, continued developing the Careismatic Brands business, and complied with management's instructions to step aside from active negotiations.  In fact, Plaintiff relied on these promises from the date they were made on October 26, 2023 through February 14, 2024.

70.     By the time the 2024 Sales Incentive Compensation Plan was entered into between Plaintiff and Defendant, it did not alter or amend the promises Defendant had previously made to Plaintiff.  Plaintiff had already relied upon the promises Defendant made to both secure the Careismatic Brands business and heeded every one of Defendant's requests in connection therewith.

71.      To the extent that Defendant's promises to Plaintiff that he would be paid a 2% commission on the Careismatic Brands deal if it closed made at the time Defendant was seeking

to agree to have Plaintiff agree to continue to serve as an employee of Defendant following the drastic restructuring of Plaintiff's job and elimination of the Strategic Sales Team does not constitute a legally enforceable agreement between Plaintiff and Defendant, equity demands that Plaintiff be compensated as promised. Plaintiff's reliance on Defendant's promises was expressly to its detriment as during the period of reliance Plaintiff was required to forego using his considerable sales skills to generate commissions for other companies which would actually pay him as promised.

72.     Injustice can be avoided only by enforcement of Defendant's promises. Defendant received the full benefit of Plaintiff's induced performance — the origination of a $65 million contract — while paying Plaintiff nothing in commissions.  Allowing Defendant to retain the benefit of Plaintiff's efforts while disclaiming the promises it made to Plaintiff to induce him to secure that benefit for Defendant is precisely the injustice promissory estoppel is designed to prevent.

73.     Accordingly, Plaintiff is entitled to recover in equity his reliance damages to include the fair market value of the compensation he elected to forego in reliance on Defendant's promises, other damages in an amount to be proven at trial, pre- and post-judgment interest, and his reasonable and necessary attorney's fees.

## VI.

## COUNT FOUR

## QUANTUM MERIT

74.     Plaintiff incorporates all preceding paragraphs by reference. This count is pleaded in the alternative to Count I pursuant to Federal Rule of Civil Procedure 8(d).

75.     Plaintiff rendered valuable services to Defendant. Beginning in October 2023, Plaintiff identified, originated, and developed the Careismatic Brands account — Defendant's

largest private-sector deal. Plaintiff attended the URA 2023 trade show, initiated the relationship with Careismatic Brand's Chief Operating Officer, arranged and led the decisive October 25, 2023 meetings with Careismatic Brand's executive team, briefed Defendant's executives on strategy, and supported the account through closing. Defendant accepted and retained the benefit of those services. The Careismatic Brands contract, valued at approximately $65 million, would not have existed but for Plaintiff's origination efforts.

76.     Defendant had reasonable notice that Plaintiff expected compensation for his services. Defendant's Executive Vice President, Mr. Zisk, expressly promised Plaintiff a 2% commission on the Careismatic deal in October and November 2023. Defendant's own compensation structure — including its referral program paying outside consultants 3% merely for identifying an opportunity — confirms the company understood that originating a $65 million account carried significant compensable value. Defendant accepted Plaintiff's services with full knowledge that he expected to be paid for them.

77.     In refusing to pay to Plaintiff the compensation they knew he expected (because Defendant had, in fact, promised it), Defendant has been unjustly enriched. Defendant received the benefit of a $65 million contract through Plaintiff's efforts and paid him nothing in commissions. Allowing Defendant to retain that benefit without compensating Plaintiff would be unjust.

78.     Plaintiff is entitled to recover the reasonable value of the services he rendered, in an amount to be determined at trial, which Plaintiff alleges is no less than $800,000 based on the 2% commission rate Defendant's own executives promised and the industry-standard rates reflected in Defendant's own referral program.

## VII.

## CONDITIONS PRECEDENT

79.     Plaintiff asserts that all conditions precedent necessary for recovery have been performed or have occurred. Plaintiff engaged counsel and made formal written demand on Defendant prior to filing suit.

## PRAYER

WHEREFORE, Plaintiff Daniel Lubic respectfully requests that the Court enter judgment against Defendant Cart.com, Inc. as follows:

a. Actual damages in an amount to be proven at trial, including but not limited to unpaid commissions on the Careismatic Brands account and other accounts, in the amount of 2% of the revenue under the Defendant's agreements with such customers, as reasonably adjusted by the agreements between the parties;

b. In the alternative, the reasonable value of Plaintiff's services to Defendant in quantum meruit, the amount of damages proximately caused to Plaintiff in reliance on Defendant's promises, and/or Plaintiff's economic damages proximately caused by his reliance on Defendant's fraudulent representations inducing him to action, in each case in the amount to be proven at trial;

c. Exemplary damages based on Defendant's fraudulent inducement under Tex. Civ. Prac. & Rem. Code § 41.003;

d. Reasonable and necessary attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001(8);

e. Pre- and post-judgment interest at the maximum rate permitted by law; and

f. Such other and further relief as the Court deems just and proper.

Dated March 30, 2026.                          Respectfully submitted,


                                               KESSLER & COLLINS, P.C.

                                               By: /s/ Lisa C. Tulk
                                               ANTHONY J. BARBIERI
                                               Texas Bar No. 24025235
                                               S. D. Tex. Fed. Bar No. 961974
                                               abarbieri@kesslercollins.com
                                               LISA C. TULK
                                               Texas Bar No. 24047004
                                               S.D. Tex. Fed. Bar No. 742830
                                               ltulk@kesslercollins.com
                                               BAILEY FOREMAN
                                               Texas Bar No. 24150384
                                               S.D. Tex. Fed. Bar No. 3950942
                                               bforeman@kesslercollins.com

                                               500 North Akard Street, Suite 3700
                                               Dallas, Texas 75201
                                               (214) 379-0722 – Telephone
                                               (214) 373-4714 – Facsimile

                                               **COUNSEL FOR PLAINTIFF**
                                               **DANIEL LUBIC**